Dean M. Dinner (SBN 010216)
Dean.Dinner@sackstierney.com
Wesley D. Ray (SBN 026351)
Wesley.Ray@SacksTierney.com
SACKS TIERNEY P.A.
4250 N. Drinkwater Blvd., 4th Floor
Scottsdale, AZ 85251-3693
Telephone: 480.425.2600
Facsimile: 480.970.4610

Proposed Attorneys for Debtor

# UNITED STATES BANKRUPTCY COURT

## DISTRICT OF ARIZONA

| | |
|---|---|
| In Re:<br><br>**LOMAYESVA FARMS, LLC,**<br>　　　　Debtor. | Chapter 11 Proceedings<br><br>Case No. 0:18-bk-06661-SHG<br><br>**DEBTOR'S MOTION FOR INTERIM AND FINAL ORDERS: (A) AUTHORIZING DEBTOR IN POSSESSION FINANCING; (B) AUTHORIZING ADEQUATE PROTECTION; AND (C) GRANTING RELATED RELIEF** |

Lomayesva Farms, LLC, an Arizona limited liability company, debtor and debtor-in-possession in the above-captioned bankruptcy proceedings (the "Debtor" or "Lomayesva Farms"), through counsel undersigned, hereby submit this motion (the "Motion") seeking (i) entry of an interim order, substantially in the form attached hereto as Exhibit "A" (the "Interim Order"), (a) authorizing the Debtor to incur post-petition financing on an interim basis, (b) proscribing the form and manner of notice and scheduling a final hearing, and (c) granting certain related relief, and (ii) entry of a final order (a) authorizing the Debtor to incur post-petition financing on a final basis, (b) granting adequate protection; and (c) granting certain related relief. This motion is supported by the following memorandum of points and authorities and the *Declaration of Dwight Lomayesva in Support of the Debtor's First-Day Motions.* This Motion seeks immediate entry of an order granting the relief requested herein on an emergency basis under Local Bankruptcy Rule 9013(h) in order to

avoid immediate and irreparable harm to the Debtor's estate.

This Motion is supported by the entire record before the Court, by the *Declaration of Dwight Lomayesva in Support of Debtor's First Day Motions* (the "**Declaration**"), and by the following memorandum of points and authorities.

## MEMORANDUM OF POINTS AND AUTHORITIES

### I.

### JURISDICTION AND VENUE

The Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334. This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2). Venue is proper in this district pursuant to 28 U.S.C. §§ 1408 and 1409.

The bases for the relief requested herein are sections 105, 361, 362, 363(c)(2), 364(c)(1), 364(c)(2), 364(c)(3), 364(d)(1), and 364(e) of Title 11 of the United States Code (the "**Bankruptcy Code**"), Rules 2002, 4001, and 9014 of the Federal Rules of Bankruptcy Procedure (the "**Bankruptcy Rules**") and Rule 4001-4 of the Local Rules of Bankruptcy Procedure for the District of Arizona (the "**Local Rules**").

### II.

### BANKRUPTCY RULE 4001 AND LOCAL RULE 4001-4 DISCLOSURES

In accordance with the disclosure requirements of Bankruptcy Rules 4001(b)-(d) and Local Rule 4001-4(b), the material terms of the Interim Order are set forth below.[1]

| Provision | Description |
|---|---|
| **Borrower** | Lomayesva Farms, LLC (the "**Borrower**").[2] |
| **Lender** | E & S Farming, LLC ("**Lender**"). |
| **DIP Financing** | A senior secured post-petition line of credit financing of up to $3,500,000.00 with the total of advances disbursed during any single calendar week (Monday through Friday) not to exceed FOUR HUNDRED THOUSAND DOLLARS ($400,000), except for rent |

---

[1]   The following information is intended only for summary purposes and is qualified in its entirety by the provisions of the Interim Order.

[2]   Except as defined herein, all capitalized terms are defined in the Loan Agreement.

SACKS TIERNEY P.A., ATTORNEYS
4250 NORTH DRINKWATER BOULEVARD
FOURTH FLOOR
SCOTTSDALE, ARIZONA 85251–3693

2

| Provision | Description |
|---|---|
| | payments on the Leases and irrigation payments (the "**DIP Loan**"). |
| **Maturity Date** | The Lender's commitment to fund borrowings under the DIP Loan expires, the DIP Loan matures, and all principal and accrued interest owing under the DIP Loan become due in full on the earliest to occur of (i) a sale of substantially all assets of the Debtor, (ii) a default under the DIP Loan, (iii) 48 months after confirmation of plan with 4% interest (the earliest is the "**Maturity Date**") (iv) such other date as may be agreed to by the Lender and Debtor and approved by the Court or (v) the occurrence of certain designated negative events that would jeopardize the ability of the Loan being repaid or of a feasible plan being implemented. The funding will be paid back in part through the sale of crops to Lender at market rates with the proceeds being applied to the outstanding principal. |
| **Interest Rate** | 0% per year until plan confirmation and then 4% on balance. Default rate 6% per year. |
| **Fees** | None. |
| **Milestone Requirements** | Lender shall have exercised its right, pursuant to either Section 2.5 or Section 6.5of the Loan Agreement, to require that Borrower accumulate credits through deliveries of products in anticipation of a future advance, and Borrower has failed to accumulate sufficient credits to support the advance. See other Negative Events under section 5.8 of the Loan Agreement. |
| **Use of Cash** | The Debtor's cash, including all cash and other amounts on deposit or maintained in any account and any amounts generated by the sale of crops, the collection of accounts receivable, or sale of inventory, excluding equipment may be used strictly in accordance with the Budget and the provisions of adequate protection under the Interim Order. The Debtor's right to use DIP Loan automatically terminates on the Maturity Date or such other date as may be agreed to by the Lender and Debtor and approved by the Court. |
| **Budget** | The Debtor may only use DIP Loan in accordance with the Budget, with unused amounts for each period being carried forward to the next period cumulatively, and within a variance of no more than 10% per line item in any monthly period without the Lender's express written consent. The Debtor must pay U.S. Trustee fees under 28 U.S.C. § 1930 as and when due. |
| **Liens** | Super-priority Claims. Under § 364(c)(1), the DIP Obligations constitute allowed claims against the Debtor with priority over all administrative expenses, diminution claims (including all Adequate Protection Obligations), and all other claims against the Debtor, including all administrative expenses specified in §§ 503(b) and 507(b) and any claims arising under §§ 105, 326, 328, 330, 331, 503(b), 507(a), 507(b), 546(c), 726, 1113, or 1114 (the "**Super-priority Claims**"), payable from all the Debtor's prepetition and post-petition |

**SACKS TIERNEY** P.A., ATTORNEYS
4250 NORTH DRINKWATER BOULEVARD
FOURTH FLOOR
SCOTTSDALE, ARIZONA 85251-3693

| Provision | Description |
| --- | --- |
| | property and all proceeds thereof, subject only to the Carve-Out. For the avoidance of doubt, the Super-priority Claims are not payable from Avoidance Actions.<br><br>Priming Liens. As security for the DIP Obligations, effective and perfected on entry of this Interim Order and without the execution or recordation of any security agreement, control agreement, pledge, financing statement, or other similar document, the following liens (the "**Priming Liens**") are granted to the Lender, not subject to §§ 510, 549, or 550 and subject only to the Carve-Out:<br><br>(a)    First Lien on Unencumbered Property. Under § 364(c)(2), a valid, binding, continuing, enforceable, perfected first-priority lien on all Unencumbered Property;<br><br>(b)    Liens Priming the Bank's Prior Liens on Farm Products, Personal Property and Equipment and proceeds therefrom. Under § 364(d)(1), a valid, binding, continuing, enforceable, perfected first-priority priming lien on all the Debtor's prepetition and post-petition Farm Products including (1) crops, (2) livestock, (3) supplies used or produced in a farming operation, and (4) products of crops or livestock and the proceeds of such Farm Products to the Lender, Personal Property, and Equipment, which Equipment lien is superior to the lien of any blanket financing, but junior to the lien of any purchase money financing or other financing which is limited strictly to designated pieces of Equipment. ("Priming Lien");<br><br>(c)    Liens Junior to Tax Liens. Under § 364(c)(3), a valid, binding, continuing, enforceable, perfected lien on all the Debtor's pre-petition and post-petition non-Farm Product assets, including farm equipment, and proceeds from non-Farm Product assets (except Avoidance Actions) junior, as of the Petition Date, to any valid, perfected and tax lien of any federal, state, or municipal taxing authority such that, in each instance, the lien granted under this subparagraph is junior in priority to such liens;<br><br>(d)    Liens Senior to Certain Other Liens. The Priming Liens are senior to any lien avoided and preserved for the benefit of the estates under § 551 or any lien arising after the Petition Date. |
| **Adequate Protection** | Adequate Protection. Pursuant to §§ 361, 363(c)(2), 363(e) and 364(d)(1), Debtor proposes to pay Wells Fargo (defined below) adequate protection with regard to any attached and perfected interest it has in Farm Products and the proceeds therefrom in the amount of $70,000/month and adequate protection for the farm equipment in the amount of $30,000/month. (collectively, the "**Adequate Protection**")<br><br>Replacement Liens. The Bank, CRIT (defined below), holder of any agricultural lien or tax lien of any federal, state, or municipal taxing authority are each granted (effective and perfected on entry of this Interim Order) a valid, perfected replacement lien (the "**Replacement Liens**"), subject only to the Priming Lien and Carve- |

4

SACKS TIERNEY P.A., ATTORNEYS
4250 NORTH DRINKWATER BOULEVARD
FOURTH FLOOR
SCOTTSDALE, ARIZONA 85251-3693

| Provision | Description |
|---|---|
| | Out, on all the Debtor's post-petition property (including Cash Collateral but excluding all Avoidance Actions) of a type in which each of them previously had a respective perfected lien as of the Petition Date and all such property's proceeds, products, rents, and profits. Notwithstanding the foregoing, the Replacement Liens are subordinate to the Priming Liens and the Carve-Out. The Replacement Liens are valid and perfected as of the entry of the Interim Order without the need for the execution or filing of any further document. |
| **Crop Purchase Agreement** | Debtor and Lender will enter into a crop purchase agreement whereby Debtor agrees to sell its hay, including alfalfa, to Lender at market rate for 2018 – 2019 to the extent requested by Lender. Lender payments for the crops will be applied to offset amounts owed to Lender, to provide credits for future advances including the Lease payments due in July 2018, and to the extent allowed under the DIP Loan, as may be needed for farm operations and to pay expenses under the Budget. |
| **Carveout** | The Super-priority Claims and Priming Liens are subject to the payment of a carve-out (the "Carve-Out"). The Carve-Out means a carve-out of up to $250,000 for allowed, accrued, but unpaid professional fees and expenses of the Debtor and any official committee of unsecured creditors appointed in the Bankruptcy Case (the "Committee") attorneys, accountants, and consultants, to the extent such fees are approved by the Court pursuant to Sections 327-329 of the Code, along with fees owed to the United States Trustee (collectively, the "Carve-Out Expenses"), but with the Carve-Out Expenses for the Committee further limited to not more than $75,000; Such amounts may be paid monthly upon approval of the Bankruptcy Court or, upon an Event of Default, the initial $500,000 of proceeds of collateral described in the Security Documents will be shared equally between Lender and Debtor/Committee professionals, less any amounts already paid to such professionals during the case. |
| **Events of Default** | (a)     The entry of an order in the Proceeding appointing any examiner with expanded powers or a trustee to operate all or a substantial part of the Borrower's business;<br><br>(b)     The entry of an order in the Proceeding granting relief from the automatic stay allowing a third party (i) to proceed against Borrower's property whose fair market value is reasonably expected to exceed $50,000, or (ii) to commence or continue any litigation against Borrower involving potential liability not covered by insurance in excess of $250,000 in the aggregate;<br><br>(c)     The entry of any judgment or order with respect to a post-petition event against Borrower, not stayed by reason of appeal or otherwise for ten (10) days following entry, that does or would reasonably be expected to (i) cause a material adverse change in the value of Borrower's business, operations, assets, liabilities (contingent |

SACKS TIERNEY P.A., ATTORNEYS
4250 NORTH DRINKWATER BOULEVARD
FOURTH FLOOR
SCOTTSDALE, ARIZONA 85251-3693

5

| Provision | Description |
|---|---|
| | or otherwise), or financial condition or (ii) have a material adverse effect on Lender's rights and remedies under the Order; |
| | (d)     Borrower sells any of its assets subject to any lien in Lender's favor for aggregate proceeds in excess of $100,000 without Lender's written consent and without granting Lender a right to credit bid under § 363(k) of the Code, other than sales of Farm Products or other property in the ordinary course of business. |
| | (e)     Any failure to pay any principal or interest under the Note as and when the same shall become due and payable and such failure continues for five (5) days after written notice thereof to Borrower, or the failure to pay any other sum due under the Note, this Agreement or any of the other Loan Documents as and when the same shall become due and payable, which failure continues for five (5) days after written notice thereof to Borrower; |
| | (f)     Any failure or neglect to perform or observe any of the terms, provisions or covenants of this Agreement, the Note, any Security Document, the Supply Agreement or any other document or instrument executed or delivered in connection with the Loan, and such failure or neglect either cannot be remedied or, if it can be remedied, it continues un-remedied for a period of thirty (30) days after written notice thereof to Borrower; |
| | (g)     Any warranty, representation or statement contained in this Agreement, in the Note, in any Security Document, in the Supply Agreement or in any other document or instrument executed or delivered in connection with the Loan, or made or furnished to Lender by or on behalf of Borrower or Owner, shall prove to have been materially false when made or furnished; |
| | (h)     The liquidation, termination or dissolution of Borrower; |
| | (i)     Any attachment, garnishment, levy or execution upon, or judicial seizure of, any portion of any collateral or security for the Loan which may impair the lien position of Lender; |
| | (j)     The occurrence of any Event of Default under the Note, any of the Security Documents, the Supply Agreement or any other document or instrument executed or delivered in connection with the Loan; |
| | (k)     The occurrence of any Event of Default under any document or instrument given by Borrower or Owner in connection with any other indebtedness of Borrower to Lender; and |
| | (l)     If Borrower ceases to be engaged in active farming operations, or if Borrower fails or refuses to sell products produced by Borrower from such operations to Lender, at market prices, at any time when either any amount remains unpaid and outstanding hereunder or when Lender has exercised its right to accumulate a credit balance of |

SACKS TIERNEY P.A., ATTORNEYS
4250 NORTH DRINKWATER BOULEVARD
FOURTH FLOOR
SCOTTSDALE, ARIZONA 85251–3693

| Provision | Description |
|---|---|
|  | the Loan against anticipated future rent or operating expenses.[3] |

### III.

### FACTUAL BACKGROUND

1.      On June 8, 2018 (the "Petition Date"), the Debtor filed its voluntary petition in this Court for relief under Chapter 11 of Title 11 of the United States Code.[4]

2.      The Debtor continues to operate its business and manage its assets as a debtor- in-possession under 11 U.S.C. §§ 1107 and 1108.

3.      This Court has jurisdiction over this case under 28 U.S.C. §§ 157 and 1334. The relief requested herein constitutes a core proceeding under 28 U.S.C. § 157(b)(2)(A), (M).

4.      The Debtor is an Arizona limited liability company with its principal operations in La Paz County, Arizona. Accordingly, venue for the Debtor's chapter 11 case is proper in this District under 28 U.S.C. §§ 1408 and 1409.

5.      The statutory predicates for the relief requested in this Motion are 11 U.S.C. §§ 105(a); 361(1), (2) & (3); and 363(b)(1); and Rules 2002(a)(2), 4001(b) and 6003(b).

6.      No trustee or examiner has been appointed in this case, nor has an official committee of unsecured creditors been established.

   A.     **Background Facts Concerning the Debtor**

           i.      Dwight Lomayesva is an enrolled member of the Colorado River Indian Tribes ("CRIT"), a federally recognized tribe and has a valid CRIT Roll No. N0081848.

           ii.     Dwight is the sole member and manager of Lomayesva Farms, LLC.

           iii.    Lomayesva Farms has a CRIT Tribal Business License No. 00486, which expressly subjects Lomayesva Farms to the jurisdiction of the Colorado River Indian Tribes.

---

[3] If there is a conflict between the terms of the Loan documents and the terms of this Motion/Order the terms of the Loan documents shall control.

[4] Unless otherwise indicated, all chapter and section references in this Motion are to Bankruptcy Code, 11 U.S.C. §§ 101 *et seq.* All "Rule" references are to the Federal Rules of Bankruptcy Procedure.

SACKS TIERNEY P.A., ATTORNEYS
4250 NORTH DRINKWATER BOULEVARD
FOURTH FLOOR
SCOTTSDALE, ARIZONA 85251–3693

SACKS TIERNEY P.A., ATTORNEYS
4250 NORTH DRINKWATER BOULEVARD
FOURTH FLOOR
SCOTTSDALE, ARIZONA 85251–3693

iv. Lomayesva Farms operates farming operations and a small livestock operation from various locations on the CRIT Reservation.

v. Dwight leases approximately 10,000 acres from CRIT upon which the farm product/crops and the livestock operations are conducted and in turn subleases the property to Lomayesva Farms. The operation is primarily an alfalfa ranch. Its business address is 29855 Mohave Rd. Parker, AZ that is located on the CRIT reservation.

vi. All Lomayesva Farms' farming operations, equipment, personal property and other items defined as Collateral in Wells Fargo's Complaint is located exclusively within the confines of the CRIT reservation.

vii. Debtor has an urgent and immediate need to irrigate, spray, fertilize, tend to the growing crops, and harvest the crops. Without immediate access to funds, Lomayesva Farms will lose the ability to harvest hay during the 2018 growing season and cash generated from farm operations will be virtually zero.

viii. The Debtor proposes to operate according to the cash flow budget attached to this Motion as Exhibit "B".

**B.** **Pre-petition Debt and Security Interests**

1. Prepetition, Wells Fargo Bank, National Association ("Bank" or "Wells Fargo") made several loans to Debtor, including the following:

i. A loan in the original principal amount of $300,000, as evidenced by, among other things, a Promissory Note dated November 5, 2013, executed by Debtor in favor of Wells Fargo ("Obligation #158/166");

ii. A loan in the original principal amount of $800,000, as evidenced by, among other things, a Business Lending Confirmation Letter dated December 22, 2014, executed by Debtor and Wells Fargo ("Obligation #208");

iii. A loan in the original principal amount of $1,194,000, as evidenced by, among other things, a Business Lending Confirmation Letter dated January 13, 2015, executed by Debtor and Wells Fargo ("Obligation #232");

iv. A loan in the original principal amount of $1,239,786, as evidenced by, among

other things, a Promissory Note dated August 3, 2015, executed by Debtor in favor of Wells Fargo ("Obligation #240");

      v.     A loan in the original principal amount of $1,560,214, as evidenced by, among other things, a Promissory Note dated August 3, 2015, executed by Debtor in favor of Wells Fargo ("Obligation #257");

      vi.     A loan in the original principal amount of $6,000,000, as evidenced by, among other things, a Business Lending Confirmation Letter dated March 10, 2017, executed by Debtor and Wells Fargo ("Obligation #265/273"); and

      vii.     A revolving line of credit in the principal amount of $100,000, as evidenced by, among other things, a Business Lending Confirmation Letter dated December 14, 2016, executed by Debtor and Wells Fargo ("Obligation #2811299") (collectively, the "Loans").

2.     In an effort to secure portions of the Loans Wells Fargo had Debtor execute a security agreement purporting to grant a security interest in Debtor's inventory, accounts, crop, livestock, and equipment ("WF Collateral"). Obligations 186/166, 240, and 257 were not governed by security agreements with Wells Fargo.

3.     In an attempt to perfect its security interest in the WF Collateral Wells Fargo filed various UCC-1 financing statement with the Arizona Secretary of State's office.

4.     Wells Fargo asserts that the Debtor defaulted on the Loans.

5.     Pre-petition, Wells Fargo filed a complaint in Maricopa County Superior Court for the State of Arizona in Case No. CV 2017-015584 seeking appointment of a receiver over the business of the Debtor, determination of breach of contract and foreclosure of a security interest (the "State Lawsuit"). Among other things, the Bank asserted that the Debtor was in breach of, and that the Bank has a security interest in Debtor's "inventory, accounts, crops, livestock, and equipment". The Bank asserted that Debtor owes approximately $9,182,531.88 on the Loans.

6.     Debtor filed a Motion to Dismiss the Bank's Complaint both on jurisdictional grounds and asserting that the Bank had not properly attached and perfected security interests in the Bank's Collateral. The State Court agreed that it did not have jurisdiction over portions of the Bank's Collateral but denied the Motion to Dismiss. Debtor has filed an answer in the State Lawsuit.

SACKS TIERNEY P.A., ATTORNEYS
4250 NORTH DRINKWATER BOULEVARD
FOURTH FLOOR
SCOTTSDALE, ARIZONA 85251-3693

SACKS TIERNEY P.A., ATTORNEYS
4250 NORTH DRINKWATER BOULEVARD
FOURTH FLOOR
SCOTTSDALE, ARIZONA 85251-3693

7.     The Bank has valued the farm equipment at a fair market value of $4,061,675 and a liquidation value of $2,843,173 as of August 8, 2017.

8.     The Debtor has asserted that Wells Fargo doesn't have a properly perfected security interest in any Farm Products or the proceeds therefrom.

9.     The CRIT asserts an interest in the improvements to the property leased by Debtor and its principal.  Under the leases the CRIT have the right to all improvements on the property upon termination of the leases.  In 2016, together with some years prior to that year, the CRIT and Wells Fargo entered into subordination agreements whereby the CRIT agreed to subordinate their interests to the security interests of Wells Fargo including for crops being grown by the Debtor during that year.  However, no such subordination agreements were executed for the years 2017 and 2018.  All such subordination agreements provide that the subordination is only effective if the rent on leases with CRIT and CRIT members has been paid.  Approximately, $2.5 million in rent payments will be due on July 1, 2018 on the leases between the Debtor and the CRIT and its individual members as lessors.

10.     Lender is a hay broker who has purchased substantial portions of Debtor's crops in the past.

11.     Prepetition Wells Fargo refused to advance any funds to Debtor or allow Debtor to use any accounts receivable funds to among other things continue farm operations including paying for water, fertilizer or pesticide for the crops, or pay employees.  As a result, the Debtor's crops were literally dying of thirst and being wasted.  Ultimately, one of Debtor's customers, the Lender, agreed to fund some of the immediate needs to avoid complete loss of the crops. The Lender loaned the Debtor approximately $1.2 million to pay for farm products, water, and labor necessary for raising the crops.  This funding included approximately $285,000 paid for irrigation for the crops. Wells Fargo consented to the advance of funds to pay the irrigation bill.  Absent these advances, the farms would have discontinued operations several months ago.

12.     Prepetition the Debtor approached various sources regarding funding for the continued operations of its farming operations.  Ultimately, following negotiations the Debtor determined that the proposal by the Lender was within competitive market terms and provided the

most advantageous terms to the Debtor under the circumstances.

13. The Debtor does not believe that it is able to obtain post-petition financing or other financing accommodations from any prospective lender or group of lenders on more favorable terms and conditions than those contained in the DIP Loan and described in this Motion and related proposed orders. Substantially complete copies of the DIP Loan Agreement, DIP Security Agreement, and DIP Promissory Note are attached hereto as Exhibits "C", "D" & "E". The DIP Loan was negotiated in good faith and at arm's length, and extensively and diligently considered by the Debtor. The management of the Debtor believes that the proposed terms of the DIP Loan are fair and reasonable in light of current market conditions and is in the best interests of the Debtor's estate. As of the Petition Date, the Debtor has approximately $10,000 cash on hand. Accordingly, without access to the DIP Financing or cash collateral, the Debtor will not have sufficient working capital to continue operating as a going concern while they attempt to complete restructuring process. Absent immediate access to cash collateral, the Debtor would be forced to shut down the business and convert the case to chapter 7, which would have a tremendously adverse effect on the Debtor's estate and its employees, vendors, creditors and other constituents.

14. Lender and Debtor will enter into a Supply Agreement concurrently with the Interim Order, which agreement provides for the purchase of Debtor's crops upon current market terms and prices. A copy of the Supply Agreement is attached hereto as Exhibit "F".

15. The financing to be provided under the DIP Loan and the use of cash collateral will allow the Debtor to, among other things: (a) continue to operate its farming business in an orderly manner; (b) maintain its valuable relationships with vendors, suppliers, customers, and employees; and (c) support the Debtor's working capital, general corporate and overall operational needs - all of which are necessary to preserve and maintain the going-concern value of the Debtor's business and, ultimately, help ensure a successful restructuring.

## IV.

## **RELIEF REQUESTED**

By this Motion, the Debtor request entry of an interim order, pursuant to sections 105, 361, 362, 363, 364(c)(1), 364(c)(2), 364(c)(3), and 364(e) of the Bankruptcy Code and Bankruptcy Rules

SACKS TIERNEY P.A., ATTORNEYS
4250 NORTH DRINKWATER BOULEVARD
FOURTH FLOOR
SCOTTSDALE, ARIZONA 85251-3693

2002, 4001, and 9014, and Local Rule 4001-4, (a) authorizing the Debtor to incur post-petition financing on an interim and final basis in an aggregate amount not to exceed $3,500,000 (on an interim basis), (b) authorizing the Debtor to execute and deliver any documents necessary to evidence the DIP Loan, (c) authorizing the Debtor's use of the proceeds of the DIP Loan, (c) vacating and modifying the automatic stay to the extent necessary to implement the DIP Loan and (d) granting certain related relief.

## V.

## BASIS FOR RELIEF

As set forth in detail above, the DIP Loan is the best financing available to the Debtor at this time. The Debtor has been unable to procure sufficient financing: (i) in the form of unsecured credit allowable under section 503(b)(1) of the Bankruptcy Code; (ii) solely as an administrative expense under sections 364(a) and (b) of the Bankruptcy Code; or (iii) in exchange solely for the grant of a super-priority administrative expense claim pursuant to section 364(c) of the Bankruptcy Code. Thus, based on the foregoing and for the reasons set forth below, the Debtor submits that they it has satisfied the requirements to access post-petition financing on a super-priority, secured basis pursuant to section 364 of the Bankruptcy Code.

### 1. The Debtor Should be Authorized to Obtain Postpetition Financing Under Section 364 of the Bankruptcy Code

Pursuant to section 364(c) of the Bankruptcy Code, a court may authorize a debtor to incur debt that is (a) entitled to a super-priority administrative expense status; (b) secured by a lien on otherwise unencumbered property; or (c) secured by a junior lien on encumbered property if the debtor cannot obtain post-petition credit on an unsecured basis, on an administrative expense priority, or secured solely by junior liens on the debtor's assets. *See* 11 U.S.C. § 364(c); *In re Barbara K. Enters, Inc.*, No. 08-11474 (MG), 2008 WL 2439649, at *8 (Bankr. S.D.N.Y. June 16, 2008) (in order for a debtor to obtain post-petition secured credit under section 364, the debtor must prove that it was unable to reasonably obtain secure credit elsewhere); *Pearl-Phil GMT (Far East) Ltd. v. Caldor Corp.*, 266 B.R. 575, 584 (S.D.N.Y. 2001) (super-priority administrative expenses authorized where debtor could not obtain credit as an administrative expense).

SACKS TIERNEY P.A., ATTORNEYS
4250 NORTH DRINKWATER BOULEVARD
FOURTH FLOOR
SCOTTSDALE, ARIZONA 85251–3693

Courts have fashioned guidelines in applying these statutory requirements. Generally, courts advocate using a "holistic approach" to evaluate post-petition financing agreements, which focuses on the transaction as a whole. As one court has noted:

Obtaining credit should be permitted not only because it is not available elsewhere, which could suggest the unsoundness of the basis for use of the funds generated by credit, but also because the credit acquired is of significant benefit to the debtor's estate and . . . the terms of the proposed loan are within the bounds of reason, irrespective of the inability of the debtor to obtain comparable credit elsewhere.

In *re Aqua Assocs.*, 123 B.R. 192, 196 (Bankr. E.D. Pa. 1991); *see also In re YL W. 87th Holdings I LLC*, 423 B.R. 421, 442 (Bankr. S.D.N.Y. 2010).

More specifically, in evaluating a debtor's proposed post-petition financing, courts consider whether the post-petition financing: (a) is necessary to preserve the assets of the estate and is necessary, essential, and appropriate for continued operation of the debtor's business; (b) is in the best interests of the debtor's creditors and estates; (c) is an exercise of the debtor's sound and reasonable business judgment; (d) was negotiated in good faith and at arm's length between the debtor, on the one hand, and the lender on the other; and (e) contains terms that are fair, reasonable, and adequate, given the circumstances of the debtor and the proposed post-petition lender. *See In re Farmland Indus., Inc.*, 294 B.R. 855, 881 (Bankr. W.D. Mo. 2003); *In re Lyondell Chem.* Co., No. 09-10023 (Bankr. S.D.N.Y. Feb. 27, 2009); *In re Ames Dep't Stores, Inc.*, 115 B.R. 34, 40 (Bankr. S.D.N.Y. 1990).

Here, the Debtor proposes to obtain the financing in the form provided for in the Interim Order by providing, among other things, super-priority claims, security interests, and liens pursuant to sections 364(c)(1)-(3) and 364(d) of the Bankruptcy Code. For the reasons set forth below, the Debtor submit that entry into the DIP Financing satisfies these factors.

**2. <u>The DIP Financing was negotiated in good faith, and entry into the DIP Loan is in the best interests of the Debtor's creditors and estates, is necessary to preserve estate assets, and is an exercise of the Debtor's sound and reasonable business judgment.</u>**

A debtor's decision to enter into a post-petition lending facility under section 364 of the

SACKS TIERNEY P.A., ATTORNEYS
4250 NORTH DRINKWATER BOULEVARD
FOURTH FLOOR
SCOTTSDALE, ARIZONA 85251-3693

Bankruptcy Code is governed by the business judgment standard. *See Barbara K. Enters.*, 2008 WL 2439649, at *14 (Bankr. S.D.N.Y. June 16, 2008) (explaining that courts defer to a debtor's business judgment); *Ames Dep't Stores*, 115 B.R. at 38 (noting that financing decisions under section 364 of the Bankruptcy Code must reflect a debtor's business judgment). Courts grant a debtor considerable deference in acting in accordance with its sound business judgment. *See, e.g., Barbara K. Enters.*, 2008 WL 2439649, at *14 (explaining that courts defer to a debtor's business judgment "so long as a request for financing does not 'leverage the bankruptcy process' and unfairly cede control of the reorganization to one party in interest."); *Trans World Airlines, Inc. v. Travelers Int'l AG (In re Trans World Airlines, Inc.)*, 163 B.R. 964, 974 (Bankr. D. Del. 1994) (approving postpetition loan and receivables facility because such facility "reflect[ed] sound and prudent business judgment"); *In re Simasko Prod. Co.*, 47 B.R. 444, 449 (Bankr. D. Colo. 1985) ("[D]iscretion to act with regard to business planning activities is at the heart of the debtor's power.") (citations omitted).

Specifically, to determine whether the business judgment standard is met, a court is "required to examine whether a reasonable business person would make a similar decision under similar circumstances." *In re Dura Auto. Sys., Inc.*, No. 06-11202 (KJC), 2007 Bankr. LEXIS 2764, at *272 (Bankr. D. Del. Aug. 15, 2007) (quoting *In re Exide Techs.*, 340 B.R. 222, 239 (Bankr. D. Del. 2006)); *In re Brooklyn Hosp. Ctr. and Caledonian Health Ctr., Inc.*, 341 B.R. 405, 410 (Bankr. E.D.N.Y. 2006) (the business judgment rule "is a presumption that in making a business decision, the directors of a corporation acted on an informed basis, in good faith, and in the honest belief that the action taken was in the best interests of the company") *quoting Official Comm. of Subordinated Bondholders v. Integrated Res., Inc. (In re Integrated Res., Inc.)*, 147 B.R. 650, 656 (S.D.N.Y. 1992); *see also In re Curlew Valley Assocs.*, 14 B.R. 506, 513-14 (Bankr. D. Utah 1981) (noting that courts should not second guess a debtor's business decision when that decision involves "a business judgment made in good faith, upon a reasonable basis, and within the scope of [the debtor's] authority under the [Bankruptcy] Code.") (citation omitted).

Furthermore, in determining whether the Debtor has exercised sound business judgment in deciding to enter into the DIP Loan, the Court should consider the economic terms of the DIP Loan in light of current market conditions. *See, e.g., In re Lyondell Chem. Co.*, Case No. 09-10023 (Bankr.

SACKS TIERNEY P.A., ATTORNEYS
4250 NORTH DRINKWATER BOULEVARD
FOURTH FLOOR
SCOTTSDALE, ARIZONA 85251-3693

S.D.N.Y. Feb. 27, 2009) (recognizing "the terms that are now available for DIP financings in the current economic environment aren't as desirable" as in the past). Moreover, it is appropriate for the Court to consider noneconomic benefits to the Debtor offered by a proposed post-petition financing facility. For example, in *In re ION Media Networks, Inc.*, the Bankruptcy Court for the Southern District of New York held that:

> "Although all parties . . . are naturally motivated to obtain financing on the best possible terms, the business decision to obtain credit from a particular lender is almost never based purely on economic terms. Relevant features of the financing must be evaluated, including noneconomic factors. . . . This is particularly true in a bankruptcy setting where cooperation and established alliances with creditor groups can be a vital part of building support for a restructuring that ultimately may lead to a confirmable plan of reorganization. That which helps foster consensus may be preferable to a notionally better transaction that carries the risk of promoting unwanted conflict." Case No. 09-13125 (Bankr. S.D.N.Y. July 6, 2009).

The Debtor's decision to enter into the proposed DIP Loan is an exercise of their sound business judgment that warrants approval by the Court. As described in more detail above, the Debtor's decision to enter into the DIP Loan is the culmination of a process targeted at procuring the best available financing under the circumstances. The Debtor negotiated the DIP Loan with the Lender in good faith and at arm's length to obtain the required post-petition financing on the most favorable terms possible to the Debtor.

The Debtor has determined, in their sound business judgment that the DIP Loan provides for financing on more favorable terms than any other reasonably available alternative. In fact, the DIP Loan likely represents the only post-petition financing available to the Debtor.

Moreover, entry into the DIP Loan is absolutely necessary to the preservation of estate assets and is in the best interest of the Debtor's creditors and all parties in interest. Specifically, entry into the DIP Loan is part of a comprehensive strategy that will enable the Debtor to preserve the value of their assets while a restructuring of the business. Given the Debtor's significantly constrained liquidity, the DIP Loan is of critical importance to preserving the Debtor's going concern value. In order to maximize the value of the crops that have already been planting and reap the benefit of

SACKS TIERNEY P.A., ATTORNEYS
4250 NORTH DRINKWATER BOULEVARD
FOURTH FLOOR
SCOTTSDALE, ARIZONA 85251-3693

multiple cuttings of the crops it is necessary to fund among other things water, fertilizer, pesticides, leases and labor associated with the growing of the crops.

Additionally, the Debtor's access to the DIP Financing will ensure that the value of their assets is preserved, thereby providing a greater recovery to the Debtor's creditors than would be realized if the Debtor were forced to engage in a fire-sale liquidation of their assets under chapter 7 of the Bankruptcy Code. Accordingly, the Debtor submits that the availability of credit under the DIP Financing is necessary to preserve and enhance the value of their estates for the benefit of all stakeholders in this chapter 11 case.

For these reasons, the Debtor submits that the terms of the DIP Loan was negotiated in good faith, and that entry into the DIP Loan is in the best interests of the Debtor's creditors, is necessary to preserve the value of estate assets, and is an exercise of the Debtor's sound and reasonable business judgment.

### 3. The terms of the DIP Financing are fair, reasonable, and appropriate in light of the Debtor's needs and the current market environment.

It is well recognized that the appropriateness of a proposed post-petition financing facility must be considered in light of current market conditions. *In re Lyondell Chem. Co.*, Case No. 09-10023 (Bankr. S.D.N.Y. Feb. 27, 2009); *Bray v. Shenandoah Fed. Savs. & Loan Assoc. (In re Snowshoe Co. Inc.)*, 789 F.2d 1085, 1088 (4th Cir. 1986) (noting that a debtor is not required to seek credit from every possible lender before determining such credit is unavailable). Indeed, courts often recognize that, where there are few lenders likely able and willing to extend the necessary credit to a debtor, "it would be unrealistic and unnecessary to require [a debtor] to conduct such an exhaustive search for financing." *In re Sky Valley, Inc.*, 100 B.R. 107, 113 (Bankr. N.D. Ga. 1988), *aff'd*, 99 B.R. 117 (N.D. Ga. 1989); *see also In re 495 Cent. Park Ave. Corp.*, 136 B.R. 626, 630 (Bankr. S.D.N.Y. 1992) (the Bankruptcy Code "does not require the debtor to seek alternate financing from every possible lender"). This is especially true when time is of the essence. *See In re Reading Tube Indus.*, 72 B.R. 329, 332 (Bankr. E.D. Pa. 1987). Rather, a debtor must demonstrate that it made a reasonable effort to seek credit from other sources available under sections 364(a) and (b) of the Bankruptcy. *See Snowshoe*, 789 F.2d at 1088; *see also In re Utah 7000, L.L.C.*, No. 08-21869, 2008

SACKS TIERNEY P.A., ATTORNEYS
4250 NORTH DRINKWATER BOULEVARD
FOURTH FLOOR
SCOTTSDALE, ARIZONA 85251-3693

WL 2654919, at *2 (Bankr. D. Utah July 3, 2008); *Shaw Indus., Inc v. First Nat'l Bank of PA (In re Shaw Indus., Inc.)*, 300 B.R. 861, 865 (Bankr. W.D. Pa. 2003) (where debtor made efforts by contacting "numerous" lenders and was unable to obtain credit without a priming lien, it had met its burden under section 364(d) of the Bankruptcy Code).

In the instant case, the DIP Loan terms are extraordinarily favorable to the Debtor. The terms include 1) a $3,500,000 line of credit; 2) 0% interest, unless there is a default, with 6.5% default interest; 3 ) no financing fees; 4) provide a buyer for the Debtor's hay at current market prices and terms; 5) allow repayment, in part, through setoff from the purchase of crops by Lender at <u>market prices and terms;</u> 6) provide 48 months for repayment of the DIP Loan following plan confirmation; and 7) allowing the payment of adequate protection payments to Wells Fargo of $100,000/month. Accordingly, the Debtor believes that the terms that they have negotiated with respect to the DIP Financing are favorable, fair, and appropriate.

### 4. The Priming Liens are Appropriate Under Section 364(d) of the Bankruptcy Code; Adequate Protection

Section 364(d)(1) of the Bankruptcy Code provides that a court may grant a priming lien if (a) debtor in possession financing cannot be obtained otherwise, and (b) there is adequate protection of the interest of the holder of such lien. See 11 U.S.C. § 364(d)(1). As explained above, the Debtor is unable to otherwise obtain financing from an alternative source without priming the Prior Liens in favor of the Lender. As adequate protection, the Debtor proposes to provide the Bank and CRIT with replacement liens on all the Debtor's post-petition property (including Cash Collateral but excluding all Avoidance Actions) to the same extent of the value of their interests in the Debtor's interest in any collateral, effective and perfected on entry of the Interim Order approving use of cash collateral, subject only to the Carve-Out, the Priming Lien on Farm Products, personal property, fixtures, and Equipment, and any purchase money security interests in equipment. Additionally, Debtor proposes to pay the Bank $30,000 a month as adequate protection with regard to any attached and perfected security interest it has in Equipment to be applied to the outstanding principal on the Equipment related loans ("Equipment Adequate Protection"). Debtor proposes to pay the Bank adequate protection with regard to any attached and perfected interest in has in Farm Products, any

SACKS TIERNEY P.A., ATTORNEYS
4250 NORTH DRINKWATER BOULEVARD
FOURTH FLOOR
SCOTTSDALE, ARIZONA 85251-3693

other non-Equipment collateral and the proceeds therefrom in the amount of $70,000/month (the "Farm Product Adequate Protection") to be applied to the outstanding principal on the Farm Product related loans. (Collectively, Equipment Adequate Protection and Farm Product Adequate Protection are referred to as the "Adequate Protection"). As set forth in Debtor's budget the Debtor's proposed use of the Collateral is for ordinary and necessary operating expenses of farming, which will only serve to enhance the value of the Bank's security interest. If the funding were discontinued then the crops would be left to die in the fields or be taken over by the CRIT as the landlord. For this reason, the Debtor believes that the proposed adequate protection is more than sufficient to protect Bank's interests in the Collateral. Therefore, the Debtor submits that priming the Prior Lien of Wells Fargo is appropriate.

### 5. The DIP Financing Was Negotiated in Good Faith and Should be Afforded the Protection of Section 364(e) of the Bankruptcy Code

Section 364(e) of the Bankruptcy Code protects a good faith lender's right to collect on loans extended to a debtor and its right in any lien securing those loans, even if the authority of the debtor to obtain such loans or grant such liens is later reversed or modified on appeal. Specifically, section 364(e) of the Bankruptcy Code provides that any "reversal or modification on appeal of an authorization to obtain credit or incur debt or a grant of priority or a lien under section 364 of the Bankruptcy Code shall not affect the validity of that debt incurred or priority or lien granted as long as the entity that extended credit "extended such credit in good faith." 11 U.S.C. § 364(e).

Courts generally hold that "good faith" in the context of post-petition financing means, consistent with the Uniform Commercial Code, honesty in fact in the conduct or transaction concerned. *See Unsecured Creditors' Comm. v. First Nat'l Bank & Trust Co.* (*In re Ellingsen MacLean Oil Co.*), 834 F.2d 599, 605 (6th Cir. 1987) (citing U.C.C. § 1-201(19)). Additionally, good faith is measured with respect to the good faith of the lender as contrasted to that of the borrower. *In re Lyondell Chem. Co.*, No. 09-10023 (Bankr. S.D.N.Y. Feb. 27, 2009). Moreover, a lender's desire to ensure that it is repaid, to make money on interest and fees, and to protect prepetition positions are understandable and acceptable motivations for a postpetition lender in negotiating a deal. *Id.* at 737:10-14.

SACKS TIERNEY P.A., ATTORNEYS
4250 NORTH DRINKWATER BOULEVARD
FOURTH FLOOR
SCOTTSDALE, ARIZONA 85251–3693

As explained in detail herein, the terms of the DIP Loan were negotiated in good faith and at arm's length between the Debtor and the Lender, and all of the DIP Loan obligations will be extended by the Lender in good faith (as such term is used in section 364(e) of the Bankruptcy Code). No consideration is being provided to any party to the obligations arising under the DIP Loan, other than as set forth herein. Moreover, the DIP Loan has been extended in express reliance upon the protections offered by section 364(e) of the Bankruptcy Code, and the Lender should be entitled to the full protection of section 364(e) of the Bankruptcy Code in the event that either of the orders granting the Motion (or any provision thereof) are vacated, reversed, modified on appeal, or otherwise.

### 6.  Modification of the Automatic Stay is Appropriate Under the Circumstances

The Interim Order requires that the automatic stay imposed under section 362 of the Bankruptcy Code be modified as necessary to permit the Lender to (i) implement the DIP Loan, (ii) take any act to create, validate, evidence, or perfect any lien granted or authorized under this Interim Order (although nothing in this Interim Order requires any such act), and, among other things, (iii) to charge, collect, advance, and receive payments under the DIP Loan and setoff payment owed to Debtor by Lender from acquisition of crops against the DIP Loan.

Stay modification provisions of this sort are ordinary and usual features of debtor in possession financing facilities and, in the Debtor's business judgment, are reasonable under the present circumstances. *See, e.g., In re Innkeepers USA Trust*, Case No. 10-13800 (Bankr. S.D.N.Y. Sept. 2, 2010); *In re Gen. Growth Props. Inc.*, Case No. 09-1197 (Bankr. S.D.N.Y. May 14, 2009); *In re Chemtura Corp.*, Case No. 09-11233 (Bankr. S.D.N.Y. Apr. 29, 2009). Accordingly, the Court should modify the automatic stay to the extent contemplated by the Debtor and the Lender in both the Interim Order and Final Order.

### VI.

### WAIVER OF BANKRUPTCY RULE 6004(H)

The Debtor further seeks a waiver of any stay of the effectiveness of the Interim Order (and Final Order) approving the Motion. Pursuant to Bankruptcy Rule 6004(h), "a[n] order authorizing the use, sale, or lease of property other than cash collateral is stayed until the expiration of fourteen

SACKS TIERNEY P.A., ATTORNEYS
4250 NORTH DRINKWATER BOULEVARD
FOURTH FLOOR
SCOTTSDALE, ARIZONA 85251–3693

19

(14) days after entry of the order, unless the court orders otherwise." As set forth above, the DIP Loan is essential to prevent irreparable damage to the Debtor's business, value, and ability to conduct an orderly sale process. Accordingly, the Debtor submits that ample cause exists to justify a waiver of the fourteen (14) day stay imposed by Bankruptcy Rule 6004(h), to the extent that it applies.

## VII.

### **RESERVATION OF RIGHTS**

Nothing contained herein is intended or should be construed as an admission as to the validity of any claim against the Debtor, a waiver of the Debtor's rights to dispute any claim, or an approval or assumption of any agreement, contract, or lease under section 365 of the Bankruptcy Code. Likewise, if this Court grants the relief sought herein, any payment made pursuant to the Court's order is not intended and should not be construed as an admission as to the validity of any claim or a waiver of the Debtor's rights to dispute such claim subsequently. In addition, the Debtor reserves the right to seek additional relief from this Court as relates to any of the relief requested pursuant to the Motion.

## VIII.

### **NOTICE**

No trustee, examiner, or statutory committee has been appointed in the Debtor's chapter 11 cases. The Debtor has provided notice of this Motion to: (i) the Office of the United States Trustee for the District of Arizona; (ii) the parties listed on the List of Creditors Holding the 20 Largest Unsecured Claims filed pursuant to Bankruptcy Rule 1007(d); (iii) the Internal Revenue Service; (iv) the United States Attorney's Office for the District of Arizona; (v) all parties known by the Debtor claiming to have liens on or security interests in any of the Debtor's property; and (vi) any party that has requested notice pursuant to Bankruptcy Rule 2002. In the event that the Court grants the relief requested by the Motion, the Debtor shall provide notice of the entry of the order granting such relief upon each of the foregoing parties and any other parties in interest as the Court directs. The Debtor respectfully submits that such notice is sufficient and that no further notice need be given.

## IX.

SACKS TIERNEY P.A., ATTORNEYS
4250 NORTH DRINKWATER BOULEVARD
FOURTH FLOOR
SCOTTSDALE, ARIZONA 85251–3693

## CONCLUSION

**WHEREFORE**, the Debtor respectfully requests that the Court (a) enter an order granting the relief requested in the Motion, and (b) grant such other and further relief as the Court may deem appropriate.

Dated: June 8, 2018.

SACKS TIERNEY P.A.


By: /s/ *Dean M. Dinner*
Dean M. Dinner
Proposed Attorneys for Debtor

SACKS TIERNEY P.A., ATTORNEYS
4250 NORTH DRINKWATER BOULEVARD
FOURTH FLOOR
SCOTTSDALE, ARIZONA 85251-3693