Dean M. Dinner (SBN 010216)
Dean.Dinner@sackstierney.com
Wesley D. Ray (SBN 026351)
Wesley.Ray@SacksTierney.com
SACKS TIERNEY P.A.
4250 N. Drinkwater Blvd., 4th Floor
Scottsdale, AZ 85251-3693
Telephone: 480.425.2600
Facsimile: 480.970.4610

Proposed Attorneys for Debtor

**UNITED STATES BANKRUPTCY COURT**

**DISTRICT OF ARIZONA**

| | |
|---|---|
| In Re:<br>**LOMAYESVA FARMS, LLC,**<br>    Debtor. | Chapter 11 Proceedings<br>Case No. 0:18-bk-06661-SHG<br>**DECLARATION OF DWIGHT LOMAYESVA IN SUPPORT OF DEBTOR'S FIRST-DAY MOTIONS** |

I, Dwight Lomayesva, declare:

1. I am over the age of 18 and a resident of the State of Arizona. I am knowledgeable about the business and financial affairs of the above named Debtor and am authorized to make this Declaration on behalf of Lomayesva Farms, LLC ("Debtor" or "Lomayesva Farms"). I have first-hand knowledge of the matters set forth in this Declaration and am competent to make the statements contained in this Declaration.

2. I am an enrolled member of the Colorado River Indian Tribes ("CRIT"), a federally recognized tribe and has a valid CRIT Roll No. N0081848.

3. I am the sole member and manager of Lomayesva Farms.

4. Lomayesva Farms has a CRIT Tribal Business License No. 00486, which expressly subjects Lomayesva Farms to the jurisdiction of the Colorado River Indian Tribes.

5. Lomayesva Farms operates farming operations and a small livestock operation from

various locations on the CRIT Reservation.

6. I lease approximately 10,000 acres from CRIT and individual CRIT members land upon which the farm product/crops and the livestock operations are conducted and in turn subleases the property to Lomayesva Farms. The operation is primarily an alfalfa ranch. Its business address is 29855 Mohave Rd. Parker, AZ that is located on the CRIT reservation.

7. All Lomayesva Farms' farming operations, equipment, personal property is located exclusively within the confines of the CRIT reservation.

8. Lomayesva Farms has an urgent and immediate need to irrigate, spray, tend to the growing crops, and harvest the crops. Without immediate access to funds, Lomayesva Farms will lose the ability to harvest hay during the 2018 growing season and cash generated from farm operations will be virtually zero.

9. Lomayesva Farms proposes to operate according to the budget attached to this Motion as Exhibit "A".

**Pre-petition Debt, Asserted Security Interests and Litigation.**

10. Prepetition, Wells Fargo Bank, National Association ("Wells Fargo" or "Bank") made several loans to Borrower, including the following:

    a. A loan in the original principal amount of $300,000, as evidenced by, among other things, a Promissory Note dated November 5, 2013, executed by Borrower in favor of Wells Fargo ("Obligation #158/166");

    b. A loan in the original principal amount of $800,000, as evidenced by, among other things, a Business Lending Confirmation Letter dated December 22, 2014, executed by Borrower and Wells Fargo ("Obligation #208");

    c. A loan in the original principal amount of $1,194,000, as evidenced by, among other things, a Business Lending Confirmation Letter dated January 13, 2015, executed by Borrower and Wells Fargo ("Obligation #232");

    d. A loan in the original principal amount of $1,239,786, as evidenced by, among other things, a Promissory Note dated August 3, 2015, executed by Borrower in favor of Wells Fargo ("Obligation #240");

SACKS TIERNEY P.A., ATTORNEYS
4250 NORTH DRINKWATER BOULEVARD
FOURTH FLOOR
SCOTTSDALE, ARIZONA 85251-3693

e. A loan in the original principal amount of $1,560,214, as evidenced by, among other things, a Promissory Note dated August 3, 2015, executed by Borrower in favor of Wells Fargo ("Obligation #257");

f. A loan in the original principal amount of $6,000,000, as evidenced by, among other things, a Business Lending Confirmation Letter dated March 10, 2017, executed by Borrower and Wells Fargo ("Obligation #265/273"); and

g. A revolving line of credit in the principal amount of $100,000, as evidenced by, among other things, a Business Lending Confirmation Letter dated December 14, 2016, executed by Borrower and Wells Fargo ("Obligation #2811299") (collectively, the "Loans").

11. In an effort to secure portions of the Loans Wells Fargo had Debtor execute a security agreement purporting to grant a security interest in Debtor's inventory, accounts, crop, livestock, and equipment ("WF Collateral"). Obligations 186/166, 240, and 257 were not governed by security agreements with Wells Fargo.

12. In an attempt to perfect its security interest in the WF Collateral Wells Fargo filed various UCC-1 financing statement with the Arizona Secretary of State's office.

13. Wells Fargo asserts that the Debtor defaulted on the Loans.

14. Pre-petition Wells Fargo filed a complaint in Maricopa County Superior Court for the State of Arizona in Case No. CV 2017-015584 seeking appointment of a receiver over the business of the Debtor, determination of breach of contract and foreclosure of a security interest (the "State Lawsuit"). Among other things, the Bank asserted that the Debtor was in breach of, and that the Bank has a security interest in Debtor's "inventory, accounts, crops, livestock, and equipment". The Bank asserted that Debtor owes approximately $9,182,531.88 on the Loans.

15. Debtor filed a Motion to Dismiss the Banks' Complaint both on jurisdictional grounds and asserting that the Bank had not properly attached and perfected security interests in the WF Collateral. The State Court agreed that it did not have jurisdiction over portions of the WF Collateral but denied the Motion to Dismiss. Debtor has filed an answer to the Lawsuit.

16. The Bank has valued the farm equipment at a fair market value of $4,061,675 and a liquidation value of $2,843,173 as of August 8, 2017.

3
Case 0:18-bk-06661-SHG    Doc 11    Filed 06/08/18    Entered 06/08/18 18:55:48    Desc
Main Document    Page 3 of 12

17. The Debtor has asserted that Wells Fargo doesn't have a properly perfected security interest in any Farm Products or the proceeds therefrom.

18. The CRIT asserts an interest in the improvements to the property leased by Debtor and its principal. Under the leases the CRIT have the right to all improvements on the property upon termination of the leases. In 2016, together with some years prior to that year, the CRIT and Wells Fargo entered into subordination agreements whereby the CRIT agreed to subordinate their interests to the security interests of Wells Fargo including for crops being grown by the Debtor during that year. However, no such subordination agreements have been executed for the years 2017 and 2018. All such subordination agreements provide that the subordination is only effective if the rent on leases with CRIT and CRIT members has been paid. Approximately, $2.5 million in rent payments will be due on July 1, 2018 on the leases between the Debtor and the CRIT and its individual members as lessors.

19. The Bank has valued the farm equipment at a fair market value of $4,061,675 and a liquidation value of $2,843,173 as of August 8, 2017.

20. Debtor asserts that Wells Fargo doesn't have a properly perfected security interest in any Farm Products or the proceeds therefrom.

21. An online search of the county recorder's offices in both La Paz and Mohave Counties failed to reveal a recorded fixture filing by Wells Fargo related to its claimed security interest in farm products/crops.

22. Upon information and belief, Wells Fargo has not filed a fixture filing related to its claimed security interest in farm products/crops with CRIT.

23. Upon information and belief, including responses to FOIA requests, Wells Fargo has not filed a fixture filing related to its claimed security interest in farm products/crops with the Land Title and Records Office at the Bureau of Indian Affairs ("BIA").

24. Upon information and belief, Wells Fargo has not filed a fixture filing related to its claimed security interest in farm products/crops with Recorder of Deeds of the District of Columbia.

**Employees and Wages**

25. As of the Petition Date, the Debtor employed approximately 35 people (the

"Employees").

26. Martha Mazon dba R&A Farm Labor ("R&A") employs the Employees and invoices Debtor for their services.

27. R&A's payroll system is based upon bi-weekly pay periods.

28. Payments to the Employees are generally made on the Friday immediately following the end of the payroll period, such that, upon receipt of each paycheck, each employee is paid all wages and benefits accrued as of the end of the previous payroll period.

29. As of the Petition Date Employees had accrued but unpaid wages and benefits for approximately 10 days.

30. Certain of the Employees are paid an annual salary and certain of the Employees are paid on an hourly basis.

31. Certain of the Employees receive their compensation by way of direct deposit, while others receive paper checks.

32. All payroll funds are paid directly to R&A which in turns makes disbursements to the Employees.

33. As of the Petition Date, there existed approximately $70,000 in earned but unpaid wages and commissions owing to the Employees.

34. A list of the Employees, showing their compensation rates is attached to the Wages motion as Exhibit A.

35. The greatest combined amount of earned pre-petition wages, benefit contributions and reimbursements due to any individual is approximately $5,000.

36. The Debtor believes that if the Employees are not promptly and fully paid for their pre-petition employment, a meaningful number of Employees will terminate their employment with the Debtor, and that any such termination would material harm the Debtor's operations.

**Critical Vendors**

37. Not applicable.

**DIP Financing, Cash Collateral and Adequate Protection**

38. Prepetition Wells Fargo refused to advance any funds to Debtor or allow Debtor to

use any accounts receivable funds to among other things continue farm operations including paying for water, fertilizer or pesticide for the crops, or pay employees. As a result, the Debtor's crops were literally dying of thirst. Ultimately, one of Debtor's customers, E&S Farming, LLC ("Lender"), agreed to fund some of the immediate needs to avoid complete loss of the crops. Prepetition the Lender advanced the Debtor approximately $1.2 million to pay for farm products, water, and labor necessary for raising the crops as advanced payment on crop purchases. This funding included approximately $285,000 paid to get water for the crops to keep them from withering in the fields.

39. Lender is a large hay broker who has purchased substantial portions of Debtor's crops in the past.

40. Prepetition the Debtor approached various sources regarding funding for the continued operations of its farming operations. Ultimately, following negotiations the Debtor determined that a loan proposal by the Lender was within competitive market terms and provided the most advantageous terms to the Debtor under the circumstances.

41. The proposed loan material terms by Lender to Debtor are generally described as follows:

| Provision | Description |
| --- | --- |
| **Borrower** | Lomayesva Farms (the "**Borrower**"). |
| **Lender** | E & S Farming, LLC ("**Lender**"). |
| **DIP Financing** | A senior secured post-petition line of credit financing of up to $3,500,000.00 with the total of advances disbursed during any single calendar week (Monday through Friday) not to exceed FOUR HUNDRED THOUSAND DOLLARS ($400,000), except for rent payments on the Leases and water payments (the "**DIP Loan**"). |
| **Maturity Date** | The Lender's commitment to fund borrowings under the DIP Loan expires, the DIP Loan matures, and all principal and accrued interest owing under the DIP Loan becomes due in full on the earliest to occur of (i) a sale of substantially all assets of the Debtors, (ii) a default under the DIP Loan, (iii) 48 months after confirmation of plan with 4% interest (the earliest is the "**Maturity Date**") or (iv) such other date as may be agreed to by the Lender and Debtor and approved by the Court. The funding will be paid back in part through the sale of crops to Lender at market rates with the proceeds being applied to the outstanding principal. |
| **Interest Rate** | 0% per year and then 4% on balance. Default rate 6% per year. |

SACKS TIERNEY P.A., ATTORNEYS
4250 NORTH DRINKWATER BOULEVARD
FOURTH FLOOR
SCOTTSDALE, ARIZONA 85251-3693

| Provision | Description |
|---|---|
| **Fees** | None. |
| **Milestone Requirements** | Lender shall have exercised its right, pursuant to either Section 2.5 or Section 6.5 of the Loan Agreement, to require that Borrower accumulate credits through deliveries of products in anticipation of a future advance, and Borrower has failed to accumulate sufficient credits to support the advance. See other Negative Events under section 5.8 of the Loan Agreement. |
| **Use of Cash** | The Debtor's cash, including all cash and other amounts on deposit or maintained in any account and any amounts generated by the sale of crops, the collection of accounts receivable, or sale of inventory, excluding equipment may be used strictly in accordance with the Budget and the provisions of adequate protection under the Interim Order. The Debtor's right to use DIP Loan automatically terminates on the Maturity Date or such other date as may be agreed to by the Lender and Debtor and approved by the Court. |
| **Budget** | The Debtor may only use DIP Loan in accordance with the Budget, with unused amounts for each period being carried forward to the next period cumulatively, and within a variance of no more than 10% per line item in any monthly period without the Lender's express written consent. Nonetheless, unused amounts in respect of the line item "U.S. Trustee Fees" may be used only for that line item and may not be used for any other purpose. The Debtor must pay U.S. Trustee fees under 28 U.S.C. § 1930 as and when due. |
| **Liens** | Super-priority Claims. Under § 364(c)(1), the DIP Obligations constitute allowed claims against the Debtors with priority over all administrative expenses, diminution claims (including all Adequate Protection Obligations), and all other claims against the Debtors, including all administrative expenses specified in §§ 503(b) and 507(b) and any claims arising under §§ 105, 326, 328, 330, 331, 503(b), 507(a), 507(b), 546(c), 726, 1113, or 1114 (the "**Super-priority Claims**"), payable from all the Debtors' prepetition and post-petition property and all proceeds thereof, subject only to the Carve-Out. For the avoidance of doubt, the Super-priority Claims are not payable from Avoidance Actions.<br><br>Priming Liens. As security for the DIP Obligations, effective and perfected on entry of this Interim Order and without the execution or recordation of any security agreement, control agreement, pledge, financing statement, or other similar document, the following liens (the "**Priming Liens**") are granted to the Lender, not subject to §§ 510, 549, or 550 and subject only to the Carve-Out:<br><br>(a) First Lien on Unencumbered Property. Under § 364(c)(2), a valid, binding, continuing, enforceable, perfected first-priority lien on all Unencumbered Property;<br><br>(b) Liens Priming the Bank's Prior Liens on Farm Products, Personal Property and Equipment and proceeds therefrom. Under § 364(d)(1), a valid, binding, continuing, enforceable, perfected first-priority priming lien on all the Debtors' prepetition and post-petition Farm Products including (1) crops, (2) livestock, (3) supplies used or produced in a farming operation, and (4) products of crops or livestock and the proceeds of such Farm Products to the Lender, Personal Property, and Equipment, which Equipment lien is superior to the lien of any blanket financing, but junior to the lien of any |

SACKS TIERNEY P.A., ATTORNEYS
4250 NORTH DRINKWATER BOULEVARD
FOURTH FLOOR
SCOTTSDALE, ARIZONA 85251-3693

| Provision | Description |
|---|---|
| | purchase money financing or other financing which is limited strictly to designated pieces of Equipment. ("Priming Lien");<br>    (c)    Liens Junior to Tax Liens. Under § 364(c)(3), a valid, binding, continuing, enforceable, perfected lien on all the Debtors' pre-petition and post-petition non-Farm Product assets, including farm equipment, and proceeds from non-Farm Product assets (except Avoidance Actions) junior, as of the Petition Date, to any valid, perfected and tax lien of any federal, state, or municipal taxing authority such that, in each instance, the lien granted under this subparagraph is junior in priority to such liens;<br>    (d)    Liens Senior to Certain Other Liens. The Priming Liens are senior to any lien avoided and preserved for the benefit of the estates under § 551 or any lien arising after the Petition Date. |
| **Adequate Protection** | Adequate Protection. Pursuant to §§ 361, 363(c)(2), 363(e) and 364(d)(1), Debtor proposes to pay the Bank adequate protection with regard to any attached and perfected interest in has in Farm Products and the proceeds therefrom in the amount of $70,000/month and adequate protection for the farm equipment in the amount of $30,000/month. (collectively, the "**Adequate Protection**"):<br>Replacement Liens. The Bank, CRIT, holder of any agricultural lien or tax lien of any federal, state, or municipal taxing authority are each granted (effective and perfected on entry of this Interim Order) a valid, perfected replacement lien (the "Replacement Liens"), subject only to the Priming Lien and Carve-Out, on all the Debtor's post-petition property (including Cash Collateral but excluding all Avoidance Actions) of a type in which each of had had a respective perfected lien as of the Petition Date and all such property's proceeds, products, rents, and profits. Notwithstanding the foregoing, the Replacement Liens are subordinate to the Priming Liens and the Carve-Out. The Replacement Liens are valid and perfected as of the entry of the Interim Order without the need for the execution or filing of any further document. |
| **Crop Purchase Agreement** | Debtor and Lender will enter into a crop purchase agreement whereby Debtor agrees to sell its hay, including alfalfa, to Lender at market rate for 2018 – 2019 to the extent requested by Lender. Lender payments for the crops will be applied to offset amounts owed to Lender, to provide credits for future advances including the Lease payments due in July 2018, and to the extent allowed under the DIP Loan, as may be needed for farm operations and to pay expenses under the Budget. |
| **Carveout** | The Superpriority Claims and Priming Liens are subject to the payment of a carve-out (the "Carve-Out"). The Carve-Out means a carve-out of up to $250,000 for allowed, accrued, but unpaid professional fees and expenses of the Debtor and any official committee of unsecured creditors appointed in the Bankruptcy Case (the "Committee") attorneys, accountants, and consultants, to the extent such fees are approved by the Court pursuant to Sections 327-329 of the Code, along with fees owed to the United States Trustee (collectively, the "Carve-Out Expenses"), but with the Carve-Out Expenses for the Creditors Committee further limited to not more than $75,000; Such amounts may be paid monthly upon approval of the Bankruptcy Court or, upon an Event of Default, the initial $500,000 of proceeds of collateral described in the Security Documents will be |

SACKS TIERNEY P.A., ATTORNEYS
4250 NORTH DRINKWATER BOULEVARD
FOURTH FLOOR
SCOTTSDALE, ARIZONA 85251-3693

| Provision | Description |
|---|---|
| | shared equally between Lender and Debtor/Committee professionals, less any amounts already paid to such professionals during the case. |
| **Events of Default** | (a) The entry of an order in the Proceeding appointing any examiner with expanded powers or a trustee to operate all or a substantial part of the Borrower's business;<br><br>(b) The entry of an order in the Proceeding granting relief from the automatic stay allowing a third party (i) to proceed against Borrower's property whose fair market value is reasonably expected to exceed $50,000, or (ii) to commence or continue any litigation against Borrower involving potential liability not covered by insurance in excess of $250,000 in the aggregate;<br><br>(c) The entry of any judgment or order with respect to a postpetition event against Borrower, not stayed by reason of appeal or otherwise for ten (10) days following entry, that does or would reasonably be expected to (i) cause a material adverse change in the value of Borrower's business, operations, assets, liabilities (contingent or otherwise), or financial condition or (ii) have a material adverse effect on Lender's rights and remedies under the Order;<br><br>(d) Borrower sells any of its assets subject to any lien in Lender's favor for aggregate proceeds in excess of $100,000 without Lender's written consent and without granting Lender a right to credit bid under § 363(k) of the Code, other than sales of Farm Products or other property in the ordinary course of business.<br><br>(e) Any failure to pay any principal or interest under the Note as and when the same shall become due and payable and such failure continues for five (5) days after written notice thereof to Borrower, or the failure to pay any other sum due under the Note, this Agreement or any of the other Loan Documents as and when the same shall become due and payable, which failure continues for five (5) days after written notice thereof to Borrower;<br><br>(f) Any failure or neglect to perform or observe any of the terms, provisions or covenants of this Agreement, the Note, any Security Document, the Supply Agreement or any other document or instrument executed or delivered in connection with the Loan, and such failure or neglect either cannot be remedied or, if it can be remedied, it continues unremedied for a period of thirty (30) days after written notice thereof to Borrower;<br><br>(g) Any warranty, representation or statement contained in this Agreement, in the Note, in any Security Document, in the Supply Agreement or in any other document or instrument executed or delivered in connection with the Loan, or made or furnished to Lender by or on behalf of Borrower or Owner, shall prove to have been materially false when made or furnished;<br><br>(h) The liquidation, termination or dissolution of Borrower;<br><br>(i) Any attachment, garnishment, levy or execution upon, or judicial seizure of, any portion of any collateral or security for the Loan which may impair the lien position of Lender;<br><br>(j) The occurrence of any Event of Default under the Note, any of the Security Documents, the Supply Agreement or any other document or instrument executed or delivered in connection with the Loan;<br><br>(k) The occurrence of any Event of Default under any |

SACKS TIERNEY P.A., ATTORNEYS
4250 NORTH DRINKWATER BOULEVARD
FOURTH FLOOR
SCOTTSDALE, ARIZONA 85251-3693

| Provision | Description |
|---|---|
| | document or instrument given by Borrower or Owner in connection with any other indebtedness of Borrower to Lender; and |
| | (l)  If Borrower ceases to be engaged in active farming operations, or if Borrower fails or refuses to sell products produced by Borrower from such operations to Lender, at market prices, at any time when either any amount remains unpaid and outstanding hereunder or when Lender has exercised its right to accumulate a credit balance of the Loan against anticipated future rent or operating expenses. |

42. I do not believe that Debtor is able to obtain post-petition financing or other financing accommodations from any prospective lender or group of lenders on more favorable terms and conditions than those contained in the DIP Loan and described in the DIP Motion and related proposed orders. The DIP Loan was negotiated in good faith and at arm's length, extensively and diligently considered by me. I believe that the proposed terms of the DIP Loan are fair and reasonable in light of current market conditions and is in the best interests of the Debtor's estates. As of the Petition Date, the Debtor has approximately $10,000 cash on hand. Copies of the DIP Loan Agreement, DIP Security Agreement, and DIP Promissory Note are attached as Exhibits "C", "D" & "E" to the DIP Motion. Accordingly, without access to the DIP Financing or cash collateral, the Debtor will not have sufficient working capital to continue operating as a going concern while they attempt to complete the restructuring process. Absent immediate access to cash collateral, the Debtor would be forced to shut down the business and convert the case to chapter 7, which would have a tremendously adverse effect on the Debtor's estate and their employees, vendors, creditors and other constituents.

43. Lender and Debtor will enter into a Supply Agreement concurrently with the Interim Order, which agreement provides for the purchase of Debtors crops upon current market terms and prices. A copy of the Supply Agreement is attached as Exhibit "F" to the DIP Motion.

44. The financing to be provided under the DIP Loan and the use of cash collateral will allow the Debtor to, among other things: (a) continue to operate its farming business in an orderly manner; (b) maintain its valuable relationships with vendors, suppliers, customers, and employees; and (c) support the Debtor's working capital, general corporate and overall operational needs - all of which are necessary to preserve and maintain the going-concern value of the Debtor's business

SACKS TIERNEY P.A., ATTORNEYS
4250 NORTH DRINKWATER BOULEVARD
FOURTH FLOOR
SCOTTSDALE, ARIZONA 85251-3693

and, ultimately, help ensure a successful restructuring.

45. Debtor doesn't believe that Wells Fargo has a security interest in the Farm Products/crops including the proceeds therefrom as Wells Fargo failed to properly perfect their interests.

46. The Debtor's access to working capital and liquidity through the use of the Bank's alleged collateral is vital to the ongoing operations of the Debtor's business. In operating the farming business, the Debtor must transact business with key suppliers of fertilizer, seeds, pesticides, and fulfill other business obligations continuously, and in many cases on a day-to-day basis. Any delay in the Debtor's ability to access cash would immediately thwart the Debtor's operations. Indeed, if the Debtor is not permitted to use the alleged Collateral, it would cause irreparable harm to the Debtor's business operations and render impossible the Debtor's ability to successfully reorganize.

47. As adequate protection, the Debtor proposes to provide the Bank with a replacement lien to the same extent of the value of Bank's interest in the Debtor's interest in the Collateral. Additionally, Debtor proposes to pay Wells Fargo $30,000 a month starting with July 2018 as adequate protection for the equipment to be applied to the outstanding principal on the equipment related loans. Further, Debtor proposes to pay Wells Fargo $70,000 a month starting with July 2018 as adequate protection for the other collateral to be applied to the outstanding principal on the remaining Wells Fargo Loans.

48. As set forth in Exhibit "B", the Debtor's proposed use of the Collateral is for ordinary and necessary operating expenses. Use of Bank's cash collateral for ongoing operations only serves to enhance the value of its collateral security interest. For this reason, the Debtor believes that the proposed adequate protection is more than sufficient to protect Banks interests in the Collateral.

**Utilities**

49. In the course of its business, the Debtor receives electricity, water, gas, telephone, and other services from several utility companies (the "Utilities").

50. Attached hereto as Exhibit "C" is a schedule showing the accounts maintained by the Debtor with each of the Utilities.

51. To the best of the Debtor's knowledge, none of the Utilities is currently holding a pre-petition deposit and none of them have previously required a deposit.

52. The services provided by the Utilities are absolutely essential to the Debtor's operations.

53. Any disruption in the provision of utility service would significantly harm the Debtor's ability to generate revenue, and, therefore, their prospects for reorganization.

54. The Debtor's access to working capital and liquidity through the use of cash collateral is vital to the ongoing operations of the Debtor's business.

55. In operating a farming operation, the Debtor must transact business with key suppliers and fulfill other business obligations continuously, in many cases on a day-to-day basis.

56. Many of the Debtor's suppliers require cash on delivery payment, so any delay in the Debtor's ability to access cash would immediately thwart the Debtor's operations.

Dated: June 8, 2018.

DWIGHT LOMAYESVA

*/s/ Dwight Lomayesva*