**Quarles & Brady** LLP
Firm State Bar No. 00443100
One South Church Avenue
Suite 1700
Tucson, Arizona 85701-1621
TELEPHONE 520.770.8700

Elizabeth S. Fella (025236)
elizabeth.fella@quarles.com
Molly J. Kjartanson (034063)
molly.kjartanson@quarles.com

Attorneys for Wells Fargo Bank, N.A.

# UNITED STATES BANKRUPTCY COURT

## DISTRICT OF ARIZONA

| | |
|---|---|
| In re:<br><br>LOMAYESVA FARMS, LLC,<br><br>Debtor. | Chapter 11<br><br>Case No. 0:18-bk-06661-SHG<br><br>**WELLS FARGO'S MOTION TO DISMISS** |

Wells Fargo Bank, N.A. ("**Wells Fargo**"), a secured creditor and party in interest in the above-captioned Chapter 11 bankruptcy case (the "**Bankruptcy Case**") of Lomayesva Farms, LLC ("**Debtor**"), hereby seeks the dismissal of this case under 11 U.S.C. § 1112(b) for "cause": (i) Debtor's mismanagement of its operations rises to the level of "gross mismanagement"; (ii) Debtor is suffering and will continue to suffer substantial ongoing losses, even within the protections of Chapter 11, which have the effect of diminishing the value of Wells Fargo's collateral while Wells Fargo goes uncompensated; (iii) Debtor has no ability to reorganize, and its Bankruptcy Case is creating mounting administrative expenses; and (iv) the case was filed in bad faith—orchestrated by the proposed DIP lender (a pre-petition unsecured creditor) in an attempt to ensure itself a supply of hay that is free of Wells Fargo's liens.

This Motion is supported by: (i) the attached Memorandum of Points and Authorities; and (ii) the entire record before the Court in this Chapter 11 bankruptcy case. Wells Fargo reserves the right to submit additional evidence in support of its Motion.

RESPECTFULLY SUBMITTED this 18th day of June, 2018.

QUARLES & BRADY LLP
One South Church Avenue
Suite 1700
Tucson, Arizona 85701-1621
*Attorneys for Wells Fargo Bank, N.A.*

By /s/ *Elizabeth S. Fella*
Elizabeth S. Fella
Molly J. Kjartanson

# MEMORANDUM OF POINTS AND AUTHORITIES

## I. INTRODUCTION.

This Bankruptcy Case should be dismissed. It was filed for one reason and one reason alone: to assure the proposed DIP Lender (defined in the DIP Motion), Debtor's largest customer, with access to its supply of hay. The ultimate result intended by the proposed DIP Lender is that the Bankruptcy Case will be dismissed when Debtor's cash flow proves inadequate, Wells Fargo's security interest will have been eliminated through a priming lien, the proposed DIP Lender's preference exposure will have been eliminated, and the proposed DIP Lender will own Debtor's operations without having expended a penny more than the price of the hay it purchased from Debtor via pre-payments disguised as a DIP Loan.

And Debtor will fail anyway. It is unable to keep financial records (*i.e.*, is grossly mismanaged), and, even post-petition, will suffer continuing loss or diminution to the estate. Debtor has no possibility of reorganization. While it is unusual for a Court to be asked to make such a determination early in a bankruptcy case, it is warranted here; indeed, the determination was already made by a state court-appointed receiver in February. Before Debtor is allowed to continue incurring still more administrative expenses and dissipating more of Wells Fargo's cash collateral, the Court should dismiss the case.

## II. FACTUAL BACKGROUND.

1. Debtor is an Arizona limited liability company.

2. Debtor filed a voluntary bankruptcy petition on June 8, 2018 ("**Petition Date**").

3. Prior to the Petition Date, Wells Fargo made a number of loans to Debtor (collectively, the "**Loans**"), which are described in greater detail in Wells Fargo's *Amended Omnibus Response in Opposition to Certain First Day Motions* [Dkt. No. 29] (the "**Response**"), which is incorporated herein by this reference. *See also Appendix of Loan and Security Documents* [Dkt. No. 32] (the "**Appendix**"), which is herein incorporated by this reference, at Exhibits A, C, E, G, I, M, and P.

4. As security for repayment of the Loans, Debtor granted to Wells Fargo a first-priority security interest in, among other things, Debtor's inventory, accounts, crops, livestock, equipment, and proceeds (collectively, the "**Collateral**").

5. To perfect its security interests in the Collateral, Wells Fargo (a) filed a UCC-1 Financing Statement with the Arizona Secretary of State on January 8, 2009, at File No. 2009-156-7129-5, and filed a Continuation Statement concerning that UCC-1 Financing Statement on July 15, 2013; and (b) filed a separate UCC-1 Financing Statement on January 20, 2015, at File No. 2015-000-3073-1. *See* Appendix Exhibits Q and R.

6. Debtor asserts that Wells Fargo doesn't have a perfected security interest in its "farm proceeds" collateral and/or proceeds thereof.[1] *See Declaration of Dwight Lomayesva in Support of Debtor's First Day Motions* [Dkt. No. 11] ("**Lomayesva Decl.**") at p. 4, ¶ 17. In fact, as elaborated below, Wells Fargo's liens are valid and perfected.

7. In 2017, Wells Fargo obtained an appraisal of its equipment Collateral. As of June 15, 2017, the equipment Collateral had a liquidation value of approximately $2.8 million and a fair market value of approximately $4 million.[2] Debtor has failed to provide Wells Fargo with information about its operations (although it has agreed to do so on June 22, 2018, under the *Interim Cash Collateral Order* [Dkt. No. 40]), and Wells Fargo is unaware of the value of its crop and other farm products Collateral. However, Debtor has repeatedly asserted that its crops are dying in the fields as a result of its inability to pay for water.

8. Debtor defaulted on its obligations under the Loan Documents[3] by, among other things, failing to pay amounts as they became due, including failing to make quarterly debt service payments, and failing to pay one of the Loans on its maturity date.

---

[1] *See, e.g.,* Dkt. No. 11 at p. 11. Debtor has not initiated any adversary proceeding, a preliminary step to challenging a creditor's liens.

[2] Wells Fargo reserves all its rights with respect to this valuation, given that it is approximately one year old and may no longer be accurate due to the condition of the Collateral or market conditions. The nature of equipment is such that it depreciates and does not appreciate over time.

[3] Capitalized terms not otherwise defined herein have the meanings given them in the Response.

- 4 -

9. As of May 22, 2018, Wells Fargo was owed in excess of $8,436,156.16, plus all accrued and accruing interest, attorneys' fees, and costs to which it may be entitled (the "**Indebtedness**").

10. As set forth in the Response, the State Court appointed a receiver (the "**Receiver**") for the sole purpose of evaluating Debtor's financial condition.

11. On February 20, 2018, the Receiver submitted her report to the State Court regarding Debtor's operations. A true and correct copy of that report is attached to the Response as Exhibit B (the "**Receiver's Report**"). Among other things, the Receiver determined that Debtor:

> has inadequate or non-existent financial records. . . . does not maintain a general ledger, does not reconcile its bank accounts, and has no current or historical financial statements or reliable historical financial reporting details or reports.

Ex. B p. 5, ¶ 10.

12. The Receiver concluded:

> Not only is [Debtor] facing a severe and immediate cash crisis, it appears this cash shortage cycle will be recurring. Even with an immediate cash infusion, the expected cash flow from operations in 2018 will likely be modest at best and with the lease and irrigation water obligations facing [Debtor] at the beginning of 2019, there doesn't appear to be much opportunity to materially pay down the Wells Fargo credit line in the next two years. In addition, weather, crop disease, and market prices for crops produced and sold are all risks that add variability to the potential cash flows. ***In addition, the Debtor does not have the financial systems, controls or reporting systems in place to adequately manage the financial aspects of this business operation at this time.***"

*Id*., pp. 12-13 (emphasis added).

13. In or around March, 2018, Symon Attema approached Wells Fargo and offered to purchase its Loans for approximately $3.5 million. Wells Fargo did not accept the offer.

14. Mr. Attema's company is the proposed DIP Lender. In 2017, Debtor sold approximately 90% of its hay inventory to another of Mr. Attema's companies. *See* Receiver's Report at Ex. B. Debtor states in the DIP Motion that the proposed DIP Lender loaned Debtor $1,200,000 pre-petition. *Id.; see* Dkt. No. 28. Upon information and belief, all or a part of this

antecedent debt was set off against hay Debtor delivered to the proposed DIP Lender during the preference period. *See* Dkt. No. 28. Although Wells Fargo consented to the offset of $285,000 of hay in exchange for a loan in that amount to Debtor from the proposed DIP Lender, Wells Fargo was unaware of, and did not consent to, the delivery of approximately $1,000,000 in additional hay delivered to the proposed DIP lender in exchange for additional pre-petition loans.

15. Also during the preference period, in May, 2018, the proposed DIP Lender filed a UCC-1 financing statement against Debtor.

16. The proposed DIP Lender also is the source for the funds used to pay the retainer for Debtor's counsel. *See* Dkt. No. 6, *Verified Statement Pursuant to Rule 2014 by Proposed Attorney for the Debtor*.

17. The proposed DIP Loan does not benefit the estate in any way. Under the terms of the DIP Loan, Debtor may borrow up to $3,500,000. *See* Ex. C to DIP Motion at § 2.1. Although the advances are capped at $400,000 per week, Debtor may exceed that amount to pay for rent and irrigation. *Id.*

18. In the DIP Loan Agreement, Debtor and the proposed DIP Lender agree that Debtor will pay $2,500,000 in lease payments owed to the CRIT by Debtor's equity holder on July 1, 2018.[4] *See* Ex. C to DIP Motion at §§ 2.1, 6.5. Therefore, less than three weeks after filing its Chapter 11, and in the first week of access to the DIP facility, Debtor will likely have used at least $2,500,000 and possibly as much as $3,185,230 ($2,500,000 + $285,230 + $400,000) of the available credit.

19. The lease payments Debtor proposes to make to the CRIT are on account of leases as to which its insider, Dwight Lomayesva, is the obligor. *See* Lomayesva Decl. at p. 2. Moreover, although Mr. Lomayesva alleges there are subleases between him and Debtor (which he solely owns and manages, Lomayesva Decl. at p. 1), "[t]he subleases . . . are simply unwritten understandings." DIP Motion Ex. C, p 5, § 6.5.

---

[4] Notably, this figure appears to include amounts owed for 2017 in addition to amounts owed for 2018, given that an annual lease payment of $2,200,000 is due on January 1 of each year.

- 6 -

Case 0:18-bk-06661-SHG    Doc 42    Filed 06/18/18    Entered 06/18/18 17:49:26    Desc
Main Document    Page 6 of 15

20. The proposed DIP Loan requires Debtor to use $2.5 million of the proposed DIP financing to pay these liabilities of its insider on or before July 1, 2018. *Id.*

21. A "Supply Agreement" that is part and parcel of the DIP Loan is the tail wagging the dog. *See* Ex. F to DIP Motion. Under the Supply Agreement, Debtor is obligated to give the proposed DIP Lender a right of first refusal to all of Debtor's crops, livestock, accounts, supplies, and other items (defined in the Loan Agreement as "Farm Products") except cotton. *See* Ex. F § 2 and Ex. C § 1.3. If the proposed DIP Lender decides, three business days after Debtor tenders the entirety of its Farm Products to the proposed DIP Lender, that it will not purchase all or part of them, Debtor may then sell the unpurchased portions on the open market. Ex. F § 3.

22. Under the Supply Agreement, the proposed DIP Lender will not pay cash for the crops Debtor must sell to it. Instead, it will credit Debtor's DIP Loan with the value of the crops purchased, or will provide Debtor with a credit for a future advance. *Id.* § 4. Debtor admits that in the past, the proposed DIP Lender has purchased "substantial" portions of Debtor's crops. DIP Motion at p. 10, ¶ 10. Therefore, under the DIP Loan, including the Supply Agreement, Debtor is borrowing money to operate its business, but giving up the ability to generate any cash to pay any creditor other than the proposed DIP Lender from its operations.

23. Cotton, the only "Farm Product" excluded from the Supply Agreement, is shown in Debtor's projections as being revenue-producing only in December, 2018. Ex. B to DIP Motion [Dkt. No. 10] at p. 4; Amended Ex. B [Dkt. No. 19] at p. 5. Therefore, the DIP Loan will preclude Debtor from generating cash, other than through loan advances, until approximately six (6) months after the Petition Date. Dkt. No. 19 at p. 2. And the cash generated will not be sufficient to pay the lease and irrigation payments that will be due on January 1, 2019, in the aggregate amount of almost $2.5 million.

24. Debtor does not appear to have sought financing from any entity other than Wells Fargo and the proposed DIP Lender.

25. Debtor asserts that Wells Fargo will be adequately protected against the priming proposed DIP financing by replacement liens, which Debtor offered in the same categories of post-petition assets as Wells Fargo's pre-petition Collateral, with the exception of avoidance actions under Chapter 5 of the Bankruptcy Code. *See* DIP Motion, p.17.

26. Debtor has not provided any reliable historic operating information, projections, or other financial information for the Court to determine the need for the DIP Loan, Debtor's ability to generate cash other than through the DIP Loan, or to determine whether Debtor can perform under the DIP Loan. In fact, according to the Receiver's Report, Debtor lacks any ability to create reliable financial projections.

27. Debtor's inability to understand its immediate operating needs was made clear at the first day hearings, and through the Wage Motion. Debtor asserted its payroll was approximately $76,000 in the Wage Motion. Ultimately, the report from the payroll company showed a $99,000 payroll.

28. Assuming both of Debtor's June payroll payments will be approximately equal, total June labor costs would be approximately $198,000, although the budget provided to Wells Fargo and the Court in an attempt to support the Cash Collateral Motion and DIP Motion projects only $167,000 in labor costs. *Compare* Dkt. No. 28, and Wage Motion p. 3 *with* **Exhibit A**, attached, which is a true and correct copy of the payroll report from Debtor's payroll company.

### III. THE BANKRUPTCY CASE SHOULD BE DISMISSED FOR CAUSE.

The Court must dismiss or convert a Chapter 11 case,[5] whichever is in the best interest of creditors, for cause unless the Court determines that appointment of a trustee or examiner would better serve creditors' interests. *See* 11 U.S.C. § 1112(b)(1). "Cause" is an expansive concept: Section 1112(b)(4) "includes" 16 illustrative examples of cause to dismiss, including "substantial or continuing loss to or diminution of the estate and the absence of a reasonable likelihood of rehabilitation" and "gross mismanagement of the estate." 11 U.S.C. §1112(b)(4)(A), (B); *see also*

---
[5] Conversion appears to be unavailable in this case, given that Debtor is a "farmer" and has not voluntarily requested conversion. *See* 11 U.S.C. §§ 1112(c), 101(20), and 101(21).

- 8 -

*In re AdBrite Corp.*, 290 B.R. 209, 217 (Bankr. S.D.N.Y. 2003) (explaining that factors set forth in Bankruptcy Code § 1112(b) constituting "cause" to dismiss or convert Chapter 11 case are "illustrative, not exhaustive"). A bankruptcy court retains broad discretion to identify any factors that are relevant and appropriate under the circumstances and warrant dismissal or conversion of a Chapter 11 case for "cause." *See In re Kent*, 2008 WL 5047799 at *4 (Bankr. D. Ariz. 2008) (explaining that bankruptcy court has broad discretion in determining cause for dismissal) (citing *In re Consolidated Pioneer Mortg. Entities*, 248 B.R. 368 (9th Cir. B.A.P. 2000)).

Once the moving party demonstrates cause to dismiss or convert a Chapter 11 case, the court *shall* order dismissal or conversion unless the debtor shows the existence of "unusual circumstances establishing that conversion is not in the best interest of the creditors and the estate." *See* 11 U.S.C. § 1112(b)(1)-(2).

### A. The Bankruptcy Case Was Filed in Bad Faith.

The Bankruptcy Case should be dismissed because it was filed in bad faith. Such bad faith is evident in: (i) Debtor's inability to reorganize; and (ii) Debtor's proposed DIP Lender's strategic attempt to obtain control of Debtor and use the Bankruptcy Case to eliminate Wells Fargo's liens. Moreover, despite Debtor's muddling of the law related to contractually created security interests like Wells Fargo's with that relating to statutorily imposed agricultural liens, Wells Fargo's liens are perfected; therefore, Wells Fargo *will* be irrevocably harmed if Debtor is allowed to prime Wells Fargo's already unsecured liens.

The perfection of Wells Fargo's liens will be shown in a separate legal brief to be filed with the Court on June 20, 2018. In short, the statutes and cases cited by Debtor are inapplicable, because they apply to "agricultural liens"—a different type of lien than a "security interest", which is what Debtor granted Wells Fargo in its assets. Debtor contractually agreed to grant Wells Fargo such liens in order to obtain more than $8 million in funding from Wells Fargo. Now that Debtor cannot survive without additional funding, it is disingenuous of Debtor to assert that Wells Fargo is unsecured so that it can obtain funds from a different source.

Case 0:18-bk-06661-SHG   Doc 42   Filed 06/18/18   Entered 06/18/18 17:49:26   Desc
Main Document    Page 9 of 15

The bad faith inherent in the filing of the Bankruptcy Case is apparent in the terms of the DIP Loan, which shifts all risk to creditors, while insulating the proposed DIP Lender from any risk whatsoever. The proposed DIP Lender will obtain a priming lien in all of Debtor's assets, while all but eliminating Debtor's cash flow. The proposed DIP Lender and Debtor are aware that Debtor was unable to generate positive cash flow while operating under the terms of the proposed DIP Loan pre-petition, so the proposed DIP Lender's ability to gain control of Debtor upon its default is not in question if the proposed DIP Loan is approved. Moreover, the vast majority of the proposed DIP Loan—some $2.5 million—is allocated to pay obligations of Debtor's insider, *not* Debtor.

Moreover, the proposed DIP Lender has neatly insulated itself from the significant preferential transfer liability that was created upon the filing of the Bankruptcy Case. The replacement liens Debtor has offered to Wells Fargo in post-petition property will be of the same type of collateral in which Wells Fargo held liens pre-petition, with the significant exception of avoidance actions arising under Chapter 5 of the Bankruptcy Code. The proposed DIP Lender filed a financing statement in the preference period, in addition to receiving millions of dollars in in-kind payments on its pre-petition loans in the form of hay during the preference period. Under the terms of the proposed DIP Loan, the proposed DIP Lender will foreclose on its proposed post-petition lien in "general intangibles" when Debtor ultimately fails, giving itself full control of its own preference liability to Debtor and eliminating the prior, bargained-for Wells Fargo liens (including Wells Fargo's lien in "general intangibles" such as Debtor's preference actions) that would otherwise have stood in its way.

**B.     Debtor Has No Reasonable Likelihood of Rehabilitation or of Confirming a Plan of Reorganization.**

It is well established that a debtor's inability to effectively restructure or demonstrate any reasonable prospect of rehabilitation, including the potential to confirm a feasible plan of reorganization, is sufficient cause to dismiss or convert a Chapter 11 case. *See Fossum v. Federal*

*Land Bank (In re Fossum)*, 764 F.2d 520, 521-22 (8th Cir. 1985) ("A finding that the [debtors] were unable to effectuate any plan which would be confirmable is a proper basis for dismissal of the . . . chapter 11 case."); *In re 3 Ram, Inc.*, 343 B.R. 113, 117-18 (Bankr. E.D. Pa. 2006) ("[C]onversion or dismissal of a Chapter 11 bankruptcy case is appropriate where the court finds that . . . a feasible plan is not possible.") (citations and quotations omitted). "If the Chapter 11 case cannot achieve a reorganization within the statutory requirements of the Code, then there is no point in expending estate assets on administrative expenses, or delaying creditors in the exercise of their nonbankruptcy law rights." *Id.*, 343 B.R. at 118 (citing *In re Brown*, 951 F.2d 564, 572 (3d Cir. 1991).

Indeed, Bankruptcy Code § 1112(b) specifically contemplates the prompt termination of a Chapter 11 case "where no reasonable possibility of a reorganization exists." *See In re Johnston*, 149 B.R. 158, 162 (9th Cir. B.A.P. 1992) (citation and quotation omitted); *see also Loop Corp. v. United States Trustee*, 379 F.3d 511, 516 (8th Cir. 2004), *cert. denied*, 543 U.S. 1055 (2005) (explaining that dismissal or conversion of an unsuitable Chapter 11 case is intended to "preserve estate assets by preventing the debtor in possession from gambling on the enterprise at the creditor's expense when there is no hope of rehabilitation").

Here, Debtor has no reasonable prospect of rehabilitation and has no ability to confirm a plan of reorganization. At the evidentiary hearing set in this matter, Wells Fargo will show that Debtor has no possibility of reorganization. This warrants dismissal. Wells Fargo will also show that the terms of the proposed DIP Loan do not provide it with adequate protection; therefore, the Court cannot grant the proposed DIP Loan in its current form. And by its own assertion (and the facts), Debtor cannot survive without the proposed DIP Loan: "Without immediate access to funds, [Debtor] will lose the ability to harvest hay during the 2018 growing season and cash generated . . . will be virtually zero"). Lomayesva Decl. at p. 8.

Even if, for the sake of argument, the proposed DIP Loan were somehow to be granted, Debtor has no possibility of reorganization *with* the proposed funding, as evidenced by its pre-

- 11 -

petition negative cash flows when it and the proposed DIP Lender were operating under what are, essentially, the terms of the proposed DIP Loan.

**C.    Gross Mismanagement of the Estate is Evident.**

Dismissal is also warranted because of Debtor's gross mismanagement of the estate. A good example is Debtor's filing of several budgets in advance of the first day hearings that were supposed to serve as cash collateral budgets, none of which was ultimately accurate as a cash collateral budget. In the week prior to the first day hearing, Debtor was unable to develop a cash collateral budget. It was unable to predict even its payroll cost, which was ultimately incorrect by more than $20,000.

Even pre-petition, the Receiver found that Debtor was unable to manage its business appropriately. She found that Debtor's historical and current financial data was unreliable, and that Debtor's internal financial information could not be reconciled to its own bank statements. The total inability to keep financial records constitutes gross mismanagement of the estate.

Additionally pre-petition, Debtor was converting Wells Fargo's Collateral, "paying" it to the proposed DIP Lender in exchange for operating capital without Wells Fargo's knowledge. The proposed DIP Lender and Debtor were both fully aware of Wells Fargo's liens in the Collateral, having requested Wells Fargo's permission to engage in a similar financing transaction in March, 2018. The conversion of a creditor's collateral constitutes gross mismanagement; and Debtor is attempting to use the Bankruptcy Court to validate these illegal transactions post-petition. Such a result is impermissible and should result in dismissal of the Bankruptcy Case.

**D.    Debtor Continues to Suffer Substantial Operating Losses That Will Only Worsen.**

Dismissal is also warranted because of Debtor's continuing and expected losses. The threat of continuing losses or additional diminution in value of a bankruptcy estate, when coupled with an inability to reorganize, justifies dismissal of a Chapter 11 case to avoid additional harm to creditors. Continuing loss or diminution in value may be shown where the debtor continues to

- 12 -

incur operating losses, maintains a negative cash flow, lacks an ability to pay current expenses and will be unable to satisfy its expected future expenses based on projected revenues. *See In re ARS Analytical, LLC*, 433 B.R. 848, 862 (Bankr. D.N.M. 2010) (finding that rehabilitation was impossible where future expenses would continue to exceed revenues); *In re Products Intern. Co.*, 395 B.R. 101, 110 (Bankr. D. Ariz. 2008).

In this case, Debtor's economic circumstances were extraordinarily dire as of the Petition Date; Debtor required some $325,000 of allegedly absolutely necessary funds (which the Court allowed as its permissible cash collateral expenditures between June 8 and 23), but had only $10,000 in the bank and $66,000 in un-negotiated checks. Debtor's fertilizer supplier, an absolutely necessary vendor per its own statements, had sued it for approximately half a million dollars; Debtor could not pay even these necessary bills, despite having received approximately $1.2 million in unsecured loans in the three months pre-petition. There is no basis to conclude that any reasonable possibility exists for Debtor to reverse its financial decline if it continues to borrow funds from the same party lending money pre-petition; in fact, given the magnitude of funds Debtor allegedly requires, its financial situation can only worsen.

As will be shown at trial, Debtor operated with negative cash flow in 2017 and its financial picture has become even more dire in 2018. It has failed to develop a credible business plan, provide any historic financial information, and has not established any prospect of reorganization. Rather, Debtor's only focus seems to be on obtaining the proposed DIP financing to pay rent owed on its insider's leases on July 1, 2018. Debtor has offered no solution to remedy its substantial continuing losses and financial problems other than improperly diverting Wells Fargo's Collateral. Given that Debtor has no ability to generate sufficient income, no ability to keep financial records, and its assets are fully encumbered, it is likely that Debtor was never an appropriate candidate for Chapter 11 reorganization in the first instance. Rather than prejudicing creditors with mounting losses and legal fees in a futile Chapter 11 proceeding, the Bankruptcy Case should be dismissed.

- 13 -

Case 0:18-bk-06661-SHG    Doc 42    Filed 06/18/18    Entered 06/18/18 17:49:26    Desc
Main Document    Page 13 of 15

**IV.    CONCLUSION.**

WHEREFORE, Wells Fargo respectfully requests that the Court (i) dismiss Debtor's Chapter 11 case and (ii) grant such other and further relief as is appropriate under the circumstances.

DATED this 18th day of June, 2018.

>QUARLES & BRADY LLP
>One South Church Avenue
>Suite 1700
>Tucson, Arizona 85701-1621
>*Attorneys for Wells Fargo Bank, N.A.*
>
>By /s/  *Elizabeth S. Fella*
>
>      Elizabeth S. Fella
>      Molly J. Kjartanson

- 14 -

Copies of the foregoing sent via
e-mail or U.S. Mail on this 18th
day of June, 2018, to:

Dean M. Dinner
Wesley D. Ray
SACKS TIERNEY P.A.
4250 N. Drinkwater Blvd., 4th Floor
Scottsdale, Arizona 85251
dean.dinner@sacktierney.com
wesley.ray@sacktierney.com
*Attorneys for Debtor*

Renee Sandler Shamblin
Office of the U.S. Trustee
230 North First Avenue, Suite 204
Phoenix, AZ 85003
renee.s.shamblin@usdoj.gov

Office of the U.S. Trustee
230 North First Avenue, Suite 204
Phoenix, AZ 85003
ustpregion14.px.ecf@usdoj.gov

Michael R. King
Gregory J. Gnepper
Gammage & Burnham, P.L.C.
Two North Central Ave., 15th Floor
Phoenix, AZ 85004
mking@gblaw.com
ggnepper@gblaw.com
*Attorneys for E & S Farming, LLC*


/s/ *Kelly Webster*